ace

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KENNETH EATON AND ) 
GEORGE CAMPBELL, )
 )
Plaintiffs, )
 )
vs. )          Case No.  06-4030-JAR
 )
STEVE HARSHA, ET AL., )
 )
Defendants. )
_____ )

## MEMORANDUM ORDER AND OPINION

This matter comes before the Court on the parties' cross motions for summary judgment.

Plaintiffs Kenneth Eaton and George Campbell, officers of the Topeka Police Department

("TPD"), bring this action under 42 U.S.C. §§ 1983 and 1988 and the First and Fourteenth

Amendments to the United States Constitution against their employer, the City of Topeka, and

Steve Harsha, the Chief of Police for the City of Topeka, alleging that defendants violated

plaintiffs' right to free speech.  The Court now considers motions for summary judgment filed by

defendants Harsha and the City of Topeka (Docs. 51, 53) and by plaintiffs Eaton and Campbell

(Doc. 57).  For the reasons set forth below, the Court grants defendants' motions and denies

plaintiffs' motion, and dismisses this action.

I.      Uncontroverted Facts

The following facts are uncontroverted.  Plaintiff Eaton was hired by the City of Topeka

as a law enforcement officer in 1985,  and in 1998 he was promoted to the rank of detective.

Plaintiff Campbell was hired by the City of Topeka as a law enforcement officer in 1978, and in

1987 he was promoted to the rank of detective.[1] At all times relevant to this action, Steve Harsha was the Chief of Police for the City of Topeka.

### The Overstreet Column

On February 17, 2006, the TOPEKA CAPITAL-JOURNAL published a column written by Glenda Overstreet, the president of the Topeka branch of the NAACP titled, "Who will seek justice?"  In the column, Overstreet related her experience of attending a court hearing in which a young African-American man was sentenced on drug charges.  Overstreet noted that she was the only other African-American in the courtroom besides the defendant.  Overstreet wrote that when the defendant addressed the court, he read eloquently from handwritten notes, but at the end of his presentation, the judge rendered the sentence requested by the prosecutor, "as if the young man hadn't spoken at all—or he hadn't been heard or seen at all."  Overstreet closed her article by stating that she could be reached at her email address, which she provided.

### Eaton and Campbell's Reaction to the Overstreet Column

That same day Eaton sent an email from his personal email account at his home to the editorial departments of the TOPEKA METRO NEWS and the TOPEKA CAPITAL-JOURNAL and to several fellow officers of the TPD at their TPD email accounts.  Attached to this email was a letter to the editor written by Eaton in response to Overstreet's column.  In this letter, Eaton wrote that Overstreet refers to herself as African-American in her column and asked "How is it in Africa?  Have you ever been there?  If it's so great in the 'home land', then why are you here?"  Eaton referred to the NAACP as a "Government Sponsored/Endorsed Hate group."  In referencing the African-American defendant in Overstreet's article, Eaton wrote "being a colored

---

[1]  In September 2006, Campbell retired from employment with the City of Topeka.

2

person does not give you a 'get out of trouble free card' to be used when you want it."  Later in

his letter, Eaton wrote "Yeah, I used the word, 'colored.'  If you don't like it, change what the

fourth letter in 'NAACP' stands for."  Eaton mentioned Overstreet's son,[2] and asked if she had

an "axe to grind."  Eaton further wrote that "Topeka just showed <u>again</u> how much it bends over

backwards for the black community by hiring a black city manager.  I would love to see how

much more 'qualified' our new manager was over the other 30 candidates."

On February 19, Campbell sent an email from his personal email account at his home to

Overstreet in response to her February 17 column.  Campbell's email stated:

> Glenda, can you explain why 'African-American,' when I thought
> everyone born/raised/naturlized [sic] in the USA was an
> 'American'?  You seem to be more of a racist than anyone else.  I
> was also very disappointed [sic] in your last article in the Capital
> Journal, when you seemed to feel there was an injustice being
> served on the gentelman [sic] being sentenced on drug charges,
> just because of his race.  Did it not occurr [sic] to you that he was
> being sentenced because he 'broke the law'?  Or is this a lashing
> out at the Criminal Justice System because of ███████['s] latest
> problems?

Overstreet found Campbell's statements to be disrespectful and insulting.  She also was offended

by Campbell's reference to her son.[3]  At that time, Overstreet did not know that Campbell was a

police officer.  On February 20, Overstreet replied to Campbell's email.  On February 21,

Campbell forwarded his February 19 mail and Overstreet's February 20 reply to his TPD email

account.  Later on February 21, Campbell forwarded these emails from his TPD email account to

Eaton and another TPD Detective at their respective TPD email accounts.  His signature block,

---

[2] Overstreet's son was arrested for a crime, and Campbell, in his capacity as a TPD detective, assisted in the investigation of that crime.

[3] The Court redacts the name of Overstreet's minor son from the quotation from the email, in accordance with the Judicial Conference of the United States' privacy policy on electronically filed documents.

identifying him as Detective G. Campbell, Financial Crimes Unit, Topeka Police Department,

was attached to his February 21 email to Eaton and the other detective.

On February 22, Eaton accessed his TPD email account from his home and sent a

reply to Campbell's last email to the TPD email accounts of Campbell and another detective.

Eaton also copied Overstreet on this reply.  This email included the February 19 and 20 email

exchanges between Campbell and Overstreet and Campbell's signature block identifying him as

a TPD detective.  Eaton's February 22 email stated:

> I do believe that it was some of the "Africans" that "Chose" to sell
> their own. . .Also her sons [sic] 'business' is now public and is no
> longer private since he has been arrested.  Or are we not improtant
> [sic] enough because of our skin color to do this.  I think not!
> Glenda, you too stay tuned to the editorial pages. . . . .:)

Upon receiving this email, Overstreet realized that Eaton and Campbell were TPD officers and

that they had shared these emails with at least one other police officer.  Overstreet considered

Eaton's statement abusive, insulting, and disrespectful.  She also thought that Eaton's "stay

tuned" comment was a threat, and she was concerned for her personal safety and the safety of

her family.  After receiving this email, Overstreet immediately sent an email to Al Martin,

Director of the Topeka Human Relations Commission ("THRC"), to make him aware of these

emails.

### *Public Reaction to Eaton and Campbell's Statements*

On February 22, Acting City Manager Neil Dobler sent Chief Harsha an email stating:

"We have a serious problem here.  Please read and give me a call."  Dobler attached to his

message an email he received from Martin.  Martin's email informed Dobler that Overstreet, the

president of the local NAACP branch, was "livid" over her receipt of emails from TPD officers.

4

Martin also attached to his message the email Overstreet received from Eaton that included the earlier email exchange between Overstreet and Campbell and identified Campbell as a TPD detective.  Martin suggested to Dobler that the officers apologize to Overstreet, and he informed Dobler that Overstreet had contacted the City Council and the TOPEKA CAPITAL-JOURNAL regarding the matter.

After reading the email, Chief Harsha had a conversation with Dobler.  Dobler told Chief Harsha that an investigation should be initiated immediately to determine if Eaton or Campbell had violated City policies or TPD regulations.  An investigation was initiated, and Chief Harsha put Eaton and Campbell on administrative leave with pay during this investigation.

Within minutes of Eaton and Campbell being placed on administrative leave, Chief Harsha's office was inundated with media requests, questions, and phone calls.  For several weeks, Chief Harsha spent an extra amount of time working with the Public Information Officer, Kristi Pankrantz, to handle all of the media requests.  Pankrantz testified that she typically receives seven to ten media calls a day, but for a couple weeks during this time period, she received about fifteen to twenty media calls a day.

On February 24, Eaton's letter to the editor was published in the TOPEKA METRO NEWS, and it was later published in the TOPEKA CAPITAL-JOURNAL.  Overstreet read this article, and found Eaton's comment that "just because you're African American, doesn't mean you're better than anyone" to be insulting and verbally abusive to her and to other African-Americans.  She also thought Eaton's comments about "how is it in Africa" and "why are you in America" were very offensive and that his reference to the NAACP as a "government sponsored/endorsed hate group" was incredible.  Overstreet was also disturbed by Eaton's reference to her as a "colored

person," and she believed that Eaton used that phrase to be insulting.  Overstreet was further troubled by Eaton's reference to her son.  This comment made her fearful of some conspiracy against her son because she knew that Campbell worked on her son's case and she was concerned that Eaton may also be involved in the case.  The fact that Eaton and Campbell were sharing their views with other officers caused Overstreet concern that their attitudes and possibly the attitudes of other officers would affect her son's case.  Further, Overstreet felt that Eaton's comment that Topeka bends over backwards for the African-American community by hiring an African-American City Manager was a slap across every African-American's face.  As president of the local branch of the NAACP, Overstreet received phone calls from many African-American and white members of the community who were offended by that comment.  Based on the comments of both Eaton and Campbell, Overstreet was concerned about whether these officers were able to do their job with sensitivity to diverse citizens and treat all members of the community fairly.

On or about February 24,Chief Harsha was directed to attend a meeting in City Manager Neil Dobler's office at City Hall that included Dobler, Overstreet, City Council Member John Nave, THRC Director Al Martin, Robert Bugg, Otto Vaughn, Major Tony Kirk, and Major Gary Herman.  During this meeting, Overstreet voiced her concerns over the letter to the editor and the emails.  She stated that she felt threatened by Eaton's "stay tuned" comment and by the fact that the officers had mentioned her son in their emails.  She also said that she feared retaliation and that she felt there may be some conspiracy.  Overstreet also expressed her concerns about the attitude of Eaton and Campbell and the fact that they felt it was permissible to share these abusive comments with other police officers at the TPD.  Overstreet also asked that an

6

investigation be conducted and that this matter not be swept under the carpet.  Also at this

meeting, there was general discussion on the issue of race, the African-American community,

and the police department.  Overstreet and Vaughn indicated to Major Herman that they believed

Eaton and Campbell were racists and that they wanted them fired.  Overstreet stated to Major

Herman that she was scared that Eaton may do something to her and that she was afraid for her

safety.

On February 28, Chief Harsha attended a meeting of the YWCA Resource and Advocacy

for Change and Equity (R.A.C.E.) Committee.  During the meeting, Chief Harsha was

questioned about Eaton and Campbell's emails and Eaton's letter to the editor.  Persons

attending the meeting expressed concerns to Chief Harsha that Eaton and Campbell's comments

were racially insensitive and offensive.[4]  Also on February 28, Major Kirk forwarded to Chief

Harsha email communications between Renee Wiggins, Press and Publicity Chairperson of the

Topeka Branch of the NAACP, and City Council Member Brett Blackburn.[5]  In the

communication, Wiggins presented an editorial that she had written and that would be appearing

in the NAACP's Topeka Branch monthly e-news magazine.  The editorial stated that she was

"very, very disturbed" by Eaton's letter to the editor because it "is filled with many racist

---

[4]The Court notes plaintiffs' objection to this statement of fact based on hearsay.  However, the Court
overrules that objection because Chief Harsha's testimony that persons attending this meeting questioned him
regarding Eaton and Campbell's statements is based on his personal knowledge.  Also, the fact that other persons
found these statements to be offensive is not offered to prove the truth of the matter asserted—that these comments
were offensive.  *See* Fed. R. Evid. 801(c).  Rather, defendants offer this statement to show that people at this meeting
expressed their concerns about these statements to Chief Harsha before he issued discipline to Eaton and Campbell.

[5]Plaintiffs also raise a hearsay objection to this statement of fact, but the Court overrules that objection for
the same reasons discussed above.  This statement is not offered to prove the truth of the contents of Wiggins' email
communication, but rather defendants offer this evidence to show that community members were contacting City
officials with complaints about Eaton's letter to the editor and that Chief Harsha received this complaint prior to
issuing discipline to Eaton and Campbell.

overtones not only against Ms. Overstreet but the NAACP."  She wrote that "[t]he most

disturbing part of the article to me is when he states that Ms. Overstreet's credibility as a

journalist and your NAACP branch no longer exists.  Since I am a part of the Topeka Branch

NAACP and wholeheartedly support Ms. Overstreet and her efforts, I take that comment as a

threat."  Wiggins also took issue with Eaton's comments about the hiring of Topeka's new City

Manager and found that "[i]n essence he is saying that Mr. Bonaparte is not qualified because he

is African American."  Wiggins wrote that "Eaton is clearly the one who is racist" and that "all

should be concerned about . . . such strong racist views."  Wiggins closed her editorial by

encouraging others to speak out and to contact

 local officials demanding that Eaton be fired immediately from the TPD.

On March 1, THRC Director Martin forwarded to Chief Harsha, City Manager Dobler,

Major Kirk and City Council Member Nave an email from Sonny Scroggins.[6]  In this email,

Scroggins identified himself as a long time civil rights activist and a seventh generation

American of African descent.  He wrote: "I find the comments of Mr. Eaton morally offensive,

egregious and hateful.  As a servant of the people (all), Mr. Eaton's comments only serve to

divide people."  He also stated: "What is really offensive is that he took certain liberties to be the

voice of the city and the Topeka Police Department, which gives the appearance of his opinion

being validated by the department and the city."  After seeing the emails from Wiggins and

Scroggins, Chief Harsha had concern that there were people in the community who were angry

and were perceiving the TPD as racially insensitive, which could present difficulty in policing

---

[6]Plaintiffs again raise a hearsay objection to this statement of fact, but the Court finds that this fact is not
offered to prove the truth of the matter asserted in Scroggins's email, but rather it is offered to show that community
members were complaining to City officials about Eaton and Campbell's comments and that Chief Harsha received
this complaint prior to issuing discipline to the two officers.

those areas of the community where there was such a perception.

On March 3, the TOPEKA CAPITAL-JOURNAL published *Racism: A Community Forum*.  In this article, Overstreet's February 17 column was reprinted along with Eaton's letter to the editor, a statement released by the TPD, and several letters to the editor regarding the controversy.  The editor's note at the beginning of the article stated: "Community reaction to the controversy surrounding Glenda Overstreet, the president of the local chapter of the NAACP, and the Topeka Police Detectives, Kenneth Eaton and George Campbell, has been heated, to say the least."

### Discipline to Eaton and Campbell

Also on March 3, Chief Harsha issued discipline to Eaton, suspending him for fifteen days without pay and demoting him from the rank of detective to the rank of patrol officer.  Also on that day, Chief Harsha issued discipline to Campbell, suspending him for one day without pay.  On April 7, Director of Human Resources Janet Robinson sustained the respective suspensions issued to Eaton and Campbell.

Eaton and Campbell were disciplined for violating City of Topeka Personnel Code Article IX; Fraternal Order of Police Contract Article 16; the City of Topeka's "No Discrimination or Harassment Policy"; the City of Topeka's Policy "Use of City of Topeka's Informational Technology System" subsection "Acceptable Use"; TPD General Order P01, Regulations subsections B3, B4k, C1a, C1b and C1c; TPD General Order S10, Definitions subsection D1 and Regulations subsections A1, A6, A7, A9, D2 and Attachment A; and TPD General Order P08, Procedure subsections C1c and C1i.

### Provisions in the FOP Contract

9

There is a collective bargaining agreement between the Fraternal Order of Police ("FOP"), Lodge No. 3 and the City of Topeka ("the FOP Contract"). Eaton and Campbell are members of the bargaining unit, and the FOP Contract governs discipline of bargaining unit members. Article 21 of the FOP Contract gives Management the right the discipline officers, including suspension and demotion, in order to ensure that "the public service mission of the City is to function effectively and efficiently." Under Article 16 of the FOP Contract, which Eaton and Campbell were disciplined for violating, the City reserves the right to suspend or otherwise discipline employees for violations of City and/or department rules and regulations. It further states that officers can be disciplined for violation of City or police department rules.

The FOP contract also contains a provision in Article 17, Section 12 regarding political activity. Eaton and Campbell were not disciplined under this provision. Article 17, Section 12 states:

> Bargaining Unit members choosing to seek election to the office of Mayor or City Council member shall request vacation leave or request a formal leave of absence from their position with the Topeka Police Department. The leave shall be for the period of time consistent with the campaign and if elected the member shall resign his/her position with the Topeka Police Department. While on duty, bargaining unit members shall refrain from active political campaigning of any type including wearing political buttons, distributing campaign materials or similar activities.
> Nothing herein shall be construed as preventing or prohibiting bargaining unit members from exercising their rights as citizens to express publicly or privately their opinions or to cast their votes.

Chief Harsha testified that he understands this provision to mean that bargaining unit members are free to exercise their rights as citizens to express public opinion.

The Personnel Code of the City of Topeka also contains a provision on political activity

in Article II, Section 9.  Eaton and Campbell were not charged with violating this section either.

However, that section states:

> A.  Employees choosing to seek election to the office of Mayor or City Council member shall request vacation leave or request a formal leave of absence from their position with the City for a period of time consistent with any campaign; and if elected, shall relinquish any position with the City.
> B.  While on duty, employees shall refrain from active political campaigning of any type including wearing political buttons, distributing campaign material or similar activities.
> C.  Nothing herein shall be construed as preventing or prohibiting City employees from exercising their rights as citizens to express publicly or privately their opinions or to cast their votes.

Chief Harsha testified that under this provision, standing alone, members of the bargaining unit have the same rights to express their opinions publicly or privately as any other citizen.  But under City of Topeka Personnel Code Article IX, which Eaton and Campbell were charged with violating, the City reserves the right to discipline employees for violations of City and/or department rules and regulations.

### *Violations of TPD Orders*

TPD General Order P01, Regulations subsection B3, states: "Employees must always use discretion in their private, as well as professional, life so that their conduct is unquestioned." Eaton admitted in his deposition that Overstreet and Scroggins were questioning his conduct in their complaints about his letter to the editor.

TPD General Order P01, Regulations subsection B4k, prohibits "[u]se of insubordinate, disrespectful, insolent, abusive, profane, degrading, insulting racist or sexist actions, inferences, or language to any member of the Department or to the public."  Chief Harsha believed Eaton's comments in his letter to the editor were disrespectful, insolent, degrading, insulting and racially

11

insensitive.  Further, Chief Harsha found that Eaton's statement in his email that "I do believe that it was some Africans that chose to sell their own" was racially insensitive, inflammatory and highly offensive to the African-American community.  Chief Harsha also found that Campbell's reference to Overstreet as "more of a racist than anyone else" was disrespectful, insulting, unreasonable, inappropriate, racially harassing and offensive.  Chief Harsha believed Eaton's letter to the editor was disrespectful in his statement that because Overstreet identifies herself as African-American, it is like she is better than everyone else.  Chief Harsha found that other statements in Eaton's letter were also disrespectful including his asking how is it in Africa, calling the NAACP a government sponsored/endorsed hate group, and referring to Overstreet as a "colored person."  Chief Harsha testified, however, that he did not believe that Eaton's letter to the editor expressed harm toward people of a different color, and he does not believe Eaton and Campbell are racists.  Major Kirk, an African-American officer, likened some of the statements in Eaton's letter to the editor, about going back to the motherland and bending over backwards to hire a black City Manager, to some of the things heard from white supremacists.  Major Herman also believed some of the things contained in Eaton's letter are in common with white extremists' views, such as the comment regarding going back to the homeland.

TPD General Order P01, Regulations subsection C1, states: "Employees shall refrain from any act or conduct not specifically mentioned in policies, regulations, procedures or other directives which: (a) Tends to bring the Department into disrepute, (b) Hinders the efficient operation of the Department, or (c) Reflects discredit upon the individual as an officer/employee."  Chief Harsha believed that Eaton's letter to the editor, stating that the City bends over backwards for the black community by hiring a black City Manager, was

disrespectful to the new City Manager.  Chief Harsha felt that Eaton's comment could have a

very detrimental effect his ability to establish a strong working relationship with the new City

Manager.  Chief Harsha also believed that Eaton's letter to the editor could interfere with

recruitment of African-American officers to the TPD, although there has not been anyone to his

knowledge who has said that they would not apply because of Eaton's statements.  Chief Harsha

also believed Campbell's email comments had the potential to bring the department into

disrepute, and Chief Harsha was concerned that the scrutiny from the media, the THRC, and the

NAACP added to the air of mistrust.  Chief Harsha was also concerned about how the African-

American employees felt about the matter.  Further, Chief Harsha was worried about the

relationship between Eaton, Campbell, and Major Kirk subsequent to the statements made in the

letter to the editor and the emails, and he believed that the statements had a very disruptive effect

on the functioning of the TPD.

TPD General Order S10, Definitions subsection D1, defines inappropriate material and

includes material containing racial slurs and material containing anything that offensively

addresses someone's national origin.  TPD General Order S10 Regulation subsection A9

prohibits storing or displaying offensive material on TPD premises or equipment, unless

needed for investigative purposes and authorized by the Division Commander.  TPD General

Order S10 Regulation subsection D2 states: "Employees shall not generate, store, receive or

transmit email messages containing inappropriate material."

While Eaton and Campbell were also disciplined for violating TPD General Order S10

Regulations subsections A1, A6, and A7, Chief Harsha testified that Eaton and Campbell should

not have been disciplined under these regulations.  Subsection A1 limits the use of City

13

communication systems to City related activities, but also allows for some personal use.

Subsection A6 prohibits use of TPD technology, computers, or software for profit, personal use,

or entertainment, which Chief Harsha testified was not applicable here.  And Subsection A7

prohibits the use of networks, storage, paper and magnetic media for personal entertainment or

personal business, which Chief Harsha admits that Campbell and Eaton should not have been

cited with violating.

TPD General Order P08, Procedure subsection C1c, lists as grounds for suspension or

termination: "[u]nreasonable, abusive treatment of a client, citizen or other individual in the

community or on the City payroll including verbal or nonverbal sexual or racial harassment."

Eaton acknowledges that a police officer can be suspended for the abusive treatment of a citizen

and he understands that this rule and regulation tells him that.

TPD General Order P08, Procedure subsection C1i, lists as grounds for suspension or

termination: "[d]isregard of the City's EEO/Affirmative Action policy prohibiting discrimination

on the basis of race, creed, color, marital status, national origin . . . . "  The City of Topeka's

policy on Use of City of Topeka's Information Technology System states that personal use of the

City's systems "should not interfere with the City of Topeka's business, interfere with the user's

ability to perform his or her job, interfere with the ability of other users to perform their jobs,

expose the City of Topeka to liability or embarrassment . . . or violate any other polices of the

City of Topeka or the applicable policies of any City of Topeka department."

### *Reaction to Plaintiffs' Statements and their Effect at the TPD*

After Eaton and Campbell made the statements in response to Overstreet's column, Chief

Harsha was concerned about the relationship between Eaton, Campbell, and Major Kirk.  Major

Kirk, an African-American, was the Division Commander over Eaton and Campbell in their work as detectives.  Major Kirk's day-to-day duties consisted of overseeing and managing the Criminal Investigations Division with 70 investigators and officers, setting policy for the division, and ensuring that it is operating efficiently.  Major Kirk was offended when he read Eaton's letter to the editor, and he told Chief Harsha that he was offended.  Chief Harsha was concerned about the possibility of tension between Major Kirk and Eaton.  Major Kirk is a member of the NAACP, which Eaton referred to as a government sponsored/endorsed hate group.  Major Kirk felt that Eaton's comment that the City bends over backwards to accommodate the black community by hiring a black City Manager was a slap in his face.  The comment also made Major Kirk question what Eaton and Campbell thought about him as their commander, supervisor, and leader.  Additionally, other African-American officers of the TPD expressed concern and displeasure about Eaton and Campbell's comments to Major Kirk.

Chief Harsha believes that Eaton and Campbell's emails and Eaton's letter to the editor had a very disruptive effect on the functioning of the TPD.  Because Chief Harsha's attention was focused on the fallout from the letter to the editor and the emails, he lost focus on his day-to-day duties and had to delegate the additional amount of assignments to deputy chiefs.  Chief Harsha also testified that he never had any other disciplinary matters as disruptive to his everyday function as the controversy surrounding Eaton and Campbell's comments.[7]  However, in another part of his deposition testimony, Chief Harsha stated that he had no evidence of any hindering of the efficient operation of the TPD from the time that Eaton and Campbell's comments were made and the time when they were disciplined.  Also, Chief Harsha testified that

---

[7]Chief Harsha served as the Chief of Police for the City of Topeka from December 17, 2005 until he retired from employment on June 30, 2006.

there was no rioting, no picketing at the police station, and no public protest as a result of the comments made by Eaton and Campbell.

But Chief Harsha also gave the following examples of how the controversy surrounding Eaton and Campbell's comments affected his job duties. Chief Harsha attended numerous meetings with the City Manager and the City legal department and was even called into the Mayor's office as a result of the matter regarding Eaton and Campbell's statements. Chief Harsha missed staff meetings and crime update meetings, and he had to delegate a plan of action regarding a recent crime spree to another officer because of the matter involving Eaton and Campbell. Chief Harsha also missed two or three meetings of the Mayor's Crime and Safety Committee that he would have attended but for the controversy surrounding Eaton and Campbell's comments. Further, the City had a series of recommendations regarding the TPD narcotics unit that Chief Harsha was overseeing, trying to update and implement, but he had to defer that. In implementing these recommendations, Chief Harsha was the sole keeper of a spreadsheet and he had to send updates to the City Manager's office. As a result of the matter involving Eaton and Campbell, Chief Harsha did not have a chance to work on that "hardly at all" and the implementation of the recommendations was "way behind." The Eaton and Campbell matter also interfered with work on the 2007 budget preparation. Chief Harsha had to miss meetings regarding the preparation of the TPD budget for submission to the City Council, although Chief Harsha had missed budget meetings before the Eaton and Campbell controversy arose. With the 2007 budget preparation, Chief Harsha was not able to assist in setting priorities because he was consumed with working with the Eaton and Campbell matter. Internal deadlines were not met, but, in the end, the budget was timely completed.

16

In February and March 2006, Major Herman and Chief Harsha were also working on the investigation of a TPD helicopter crash that occurred in 2005.  There was a concern that the TPD was going to lose the entire helicopter unit and that the TPD was in jeopardy of having their insurance carrier drop the helicopter insurance.  The investigation included a thorough safety inspection, bringing in helicopter pilots from other departments to assist in this, and a review of the policies, procedures, safety practices, budget, personnel and staffing.  This investigation was a priority, but Chief Harsha was unable to give attention to the helicopter investigation as a result of Eaton and Campbell's comments.

Prior to issuing discipline to Eaton and Campbell, Chief Harsha spoke with District Attorney Bob Hecht about the two detectives involved in the "email editorial stuff."  District Attorney Hecht expressed concern that issues of bias could be raised.  Chief Harsha was also concerned about the chances for successful prosecutions if defense attorneys raised issues of racial bias when Eaton and Campbell are involved.  However, this was not a basis for Campbell's discipline.  Also, Chief Harsha admitted that demoting Eaton to patrol officer would not alleviate the concern about issues of bias being raised when he could be called to testify quite often in trials either as a detective or a patrol officer.

As a result of Eaton and Campbell's emails and the letter to the editor, District Attorney Hecht distributed a memorandum dated March 16, 2006,[8] to the prosecuting attorneys in his office directing them to file a "Notice of Submission of Material That May be Considered Exculpatory," with attachments including Eaton's February 24 letter to the editor and the Eaton and Campbell emails, in all cases where Eaton or Campbell will be a material witness and the

---

[8]The Court notes that this memorandum was issued after Eaton and Campbell were disciplined.

17

defendant may be a member of a racial or ethnic minority.  The "Notice of Submission of Material That May Arguably be Considered Exculpatory" has been filed in seven cases involving Campbell and in five cases involving Eaton.  Eaton acknowledges that he has an obligation not to do anything that would interfere with the prosecution of a case.  Chief Harsha believes Eaton and Campbell's comments hindered the effective operation of the TPD by prompting District Attorney Hecht to file the statement of exculpatory evidence in these cases involving either Eaton or Campbell.  But because Chief Harsha did not receive the "Notice of Submission of Material That May Arguably be Considered Exculpatory" until two weeks after he issued discipline to Eaton and Campbell, it was not a consideration in Chief Harsha's decision to impose discipline.

District Attorney Hecht states that Eaton and Campbell's statements have affected judgments, considerations, and practices of the Office of the District Attorney in the evaluation and prosecution of criminal cases and the way in which prospective jurors are examined in voir dire when the defendant is a member of a racial or ethnic minority.  Further, the District Attorney's Office has substantial concerns as to how Eaton and Campbell's statements may affect the minority community's perception of the TPD and its willingness to cooperate with its responsibility to enhance public safety.

After the controversy arose surrounding Eaton and Campbell's statements, the Topeka branch of the NAACP contacted the United States Department of Justice ("DOJ"), submitting the letter to the editor and emails.  As a result, meetings have been held with the NAACP, the DOJ, and community leaders to mend the TPD's relationship with the minority community.[9]

---

[9]The Court notes that these meetings took place after Eaton and Campbell received discipline.

Major Herman has attended two of these meetings, and future meetings have been scheduled. Major Herman has also attended town hall meetings organized by the THRC as a result of the comments made by Eaton and Campbell. At the first town hall meeting,[10] the room was packed, with standing room only, and the media was present. Major Herman remembers the meeting as being very heated and brutal for him. Major Herman described himself as a lightning rod and it was not a happy event. Major Herman was specifically asked questions about Eaton and Campbell and why they had not been fired.[11] Major Herman informed Chief Harsha that he was brutalized at this meeting and that the TPD was painted as, if not racists, racially insensitive. Overstreet also attended this meeting, and she described the atmosphere as very charged. People in attendance at the meeting, including African-Americans, were angry at Eaton and Campbell's statements, and expressed concerned about racist attitudes at the TPD.

Major Herman testified as to how his general duties at the TPD were affected for two to three months as a result of Eaton and Campbell's comments. Every time the matter involving Eaton and Campbell was discussed on the radio, Major Herman would receive one to four phone calls asking why the TPD was tolerating that behavior. These phone calls would last fifteen to twenty-five minutes. Major Herman also fielded "probably a hundred questions" from City Council members. While Herman has taken questions from City Council members in the past, the number of inquiries related to the Eaton and Campbell matter was unprecedented. Major Herman was also required to take complaints from the public, a task that was not part of his

---

[10]The record is unclear as to whether this meeting took place before or after Eaton and Campbell were disciplined.

[11]For the same reasons above, the Court overrules plaintiffs' hearsay objection to Major Herman's testimony. Defendants offer this statement not to prove the truth of the matter asserted but to show that Major Herman received complaints regarding Eaton and Campbell.

usual duties.  During the time of the Eaton and Campbell controversy, citizens were making complaints to the THRC because they were not trusting the police.  The THRC would then contact Major Herman directly, and Major Herman would go to the THRC to take complaints. On one occasion, Major Herman met with an individual making a complaint for about four hours, taking an entire afternoon.  Major Kirk also had to go to the THRC to take at least two complaints, which was not part of his duties as a division commander, because citizens were complaining that they were not getting the best possible treatment from the TPD as a direct result of what was going on in the media.

During the controversy surrounding Eaton and Campbell's comments, Major Herman had to shift responsibilities to his subordinates, which he had never done in the two years that he had been a Major.  Major Herman shifted his responsibilities down the chain of command because Chief Harsha had shifted other responsibilities to Major Herman.  Major Herman testified that he is not familiar with any other personnel matter that was as disruptive to the TPD as the comments made by Eaton and Campbell have been.  Major Herman also described a wedge that was driven between the administration and the line officers because the officers did not agree with discipline imposed on Eaton and Campbell.  During this time, Major Herman's division was starting to "grind down," and it was hard to get investigations done in a timely manner. However, Major Herman could not recall any assignments that were not completed as a result of this matter.

Lieutenant Colonel Walt Wywadis noticed that the atmosphere at the TPD was more hectic after the Eaton and Campbell controversy with people "clamoring in corners" talking about the matter.  Lieutenant Colonel Wywadis believed that the matter affected the

department's ability to get work done because officers were standing around talking about the matter instead of concentrating on investigations or going into service on the streets.  Major Kirk also noticed a change in the atmosphere at the TPD in that it was more tense.  Major Kirk also found that the officers were spending more time listening to talk radio shows and discussing the matter instead of getting work accomplished.

On March 3, Chief Harsha received an email from Steven F. Nevil, Law Enforcement Training Coordinating Manager for the United States Attorney's Office District of Kansas, offering the DOJ to facilitate training on racial issues for TPD officers.  As a result of the Eaton and Campbell controversy, the City Manager has mandated additional cultural training, and the TPD is trying to find $18,000 in their budget to pay for the training.

On March 6, Sergeant Steve Taylor sent an email to Chief Harsha asking permission to grant Eaton until March 13, to report to street patrol duty.  Sergeant Taylor stated: "I am afraid of what could happen if he were to show up on a racial charged situation or if, heaven forbid, he ever had to use his weapon in the line of duty against a minority person."  On March 9, Eaton sent Sergeant Taylor an email anticipating his return to work and asking if he could work somewhere around the station or where his initial contact with the public would be limited. Eaton was scared about going back to work because of people's perceptions after the reaction to the statements in his and Campbell's emails.  Eaton thought the City was "on fire there for a while," and he did not want to go back on the streets.  On March 9, Sergeant Taylor requested to Major John Sidwell that Eaton wait until March 20, to return to work on the streets or get an assignment that would put him in a position of limited citizen contact.  Major Sidwell responded that he was not aware of any duty that was available with limited contact with the public, and

Sergeant Taylor replied, "I don't think putting him on the street is wise . . . ."  Chief Harsha also had safety concerns about Eaton returning to the streets and his having an interaction with a member of the minority community.  But Chief Harsha was unsure how effective Eaton would be if he left him at the law enforcement center.

Previous to the events relevant to this lawsuit, Eaton wrote a letter to the editor that was published by the TOPEKA CAPITAL-JOURNAL on July 20, 2005.  The letter was titled "Racism Exists" and discussed how the City of Topeka "bends over backward to hire and retain minorities."  Eaton was not disciplined for writing this letter to the editor.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[12]  A fact is only material under this standard if a dispute over it would effect the outcome of the suit.[13]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[14]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[15]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of

---

[12]Fed. R. Civ. P. 56(c).

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[14]*Id.*

[15]*Id.* at 251–52.

material fact.[16]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[17]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[18]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[19]  "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[20]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[21]

## III.   Discussion

The Supreme Court has explained that "[it] is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"[22]  But, "[a]t the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from

---

[16]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[17]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[18]*Id.*

[19]*Id.*

[20]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citing *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 691–92 (10th Cir.1981)), *cert. denied*, 523 U.S. 1048 (1998).

[21]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[22]*Garcetti v. Ceballos*, ___ U.S. ___, 126 S. Ct. 1951, 1955 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

those it possesses in connection with regulation of the speech of the citizenry in general."[23]  The Supreme Court recognizes that the problem is "arriv[ing] at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[24]  In this case, plaintiffs contend that defendants violated their First Amendment rights by imposing discipline for statements made in their capacity as citizens.  Defendants counter that it was lawful to impose discipline to Eaton and Campbell when their constitutional right to comment on matters of public concern is outweighed by defendants' interest in promoting the efficiency of the TPD.  All the parties have moved for summary judgment, and their various arguments are discussed in turn below.

### A.      Freedom of Speech

In their Motion for Summary Judgment, plaintiffs argue that because the City of Topeka has agreed by contract to treat bargaining unit members like all other private citizens when exercising their rights to privately or publicly express opinions, police officers employed by the City of Topeka are not subject to the limited free speech rights of public employees, as set forth in *Pickering* and *Connick*.  Article 17, Section 12 of the FOP contract provides that bargaining members who seek election to the office of Mayor or City Council member must request leave from their positions with the TPD for the duration of the campaign, and if elected, must resign from the TPD.  The provision also prohibits bargaining unit members from active political campaigning while on duty, but states that "[n]othing herein shall be construed as preventing or

---

[23]*Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563, 568 (1968).

[24]*Id.*

prohibiting bargaining unit members from exercising their rights as citizens to express publicly or privately their opinions or to cast their votes."  The Personnel Code of the City of Topeka contains an identical provision pertaining to the political activities of City employees in Article II, Section 9.  This section also states that "[n]othing herein shall be construed as preventing or prohibiting City employees from exercising their rights as citizens to express publicly or privately their opinions or to cast their votes."  Plaintiffs argue that under these provisions, the City of Topeka has agreed to treat its employees like private citizens, and therefore defendants are not permitted to punish employees for expressing opinions as private citizens.  Accordingly, plaintiffs argue that the *Pickering* and *Connick* analysis regarding speech rights of public employees is inapplicable here.  Rather, plaintiffs contend that under the First Amendment, defendants are prohibited from "proscribing speech or even expressive conduct because of disapproval of the ideas expressed."[25]  Plaintiffs allege that because defendants disciplined them for their speech as private citizens, this conduct violated the First Amendment, and therefore, plaintiffs are entitled to summary judgment.

Defendants respond that the City of Topeka has not waived its right to discipline employees for expression of public or private opinions.[26]  The Court agrees.  Kansas state law

---

[25] *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 382 (1992) (citations omitted).

[26] Defendants also point the Court to the arbitration proceedings that were held between the parties on December 18 and 19, 2006.  Plaintiffs argued to the arbitrator that under Article 17 of the FOP contract, the City has waived its ability to discipline the plaintiffs for their speech.  While the arbitrator's decision is forthcoming, defendants argue that plaintiff should not be able to present this same argument to this Court.  However, the Court disagrees.  In *McDonald v. West Branch*, 466 U.S. 284 (1984), the Supreme Court held that because Congress intended civil rights statutes to be judicially enforceable and arbitration cannot not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes, the doctrines of res judicata and collateral estoppel are inapplicable to an action under § 1983.  *Id.* at 289.  In this case, because plaintiffs bring a claim under § 1983 and are not asking the Court to set aside the arbitrator's findings, the Court will disregard the facts of the proceedings in front of the arbitrator.

applies to this Court's interpretation of the collective bargaining agreement between the FOP and the City of Topeka.[27]  Under Kansas law, the construction and interpretation of a written contract is a matter of law for the court.[28]  In analyzing the provisions of the FOP contract, the Court gives the unambiguous language its "plain, general and common meaning" and enforces the contract according to its terms.[29]  "An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners."[30]

Both Article 17, Section 12 of the FOP Contract and Article II, Section 9 of the Personnel Code of the City of Topeka set forth requirements for police officers and City employees who seek election to certain public offices.  Both of these sections conclude with the statement that "nothing herein" shall prevent or prohibit the exercise of the right to express opinions.  Based on the plain language of the provisions, the "nothing herein" clauses refer to those particular sections regarding employees running for political office.  They do not apply to the entire FOP Contract nor the Personnel Code of the City of Topeka.  In fact, the FOP Contract provides in Article 16 that the City reserves the right to suspend or otherwise discipline employees for violations of City and/or department rules and regulations.  Also, under City of Topeka Personnel Code Article IX, the City reserves the right to discipline employees for violations of City and/or department rules and regulations.

---

[27] *See Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1103 (10th Cir. 2004) (applying Oklahoma law to the interpretation of a collective bargaining agreement between the union representing Tulsa police officers and the City of Tulsa).

[28] *Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994).

[29] *Id.* (citing *Darby v. Keeran*, 505 P.2d 710 (Kan. 1973)).

[30] *Johnson County Bank v. Ross*, 13 P.3d 351, 353 (Kan. Ct. App. 2000).

In this case, Eaton and Campbell were disciplined under Article 16 of the FOP contract and Article IX of the City of Topeka Personnel Code for violating various department rules and regulations including TPD General Order P01, Regulations subsection B3, that requires employees to "use discretion in their private, as well as professional, life so that their conduct is unquestioned" and TPD General Order P01, Regulations subsection B4k, that prohibits "[u]se of insubordinate, disrespectful, insolent, abusive, profane, degrading, insulting racist or sexist actions, inferences, or language to any member of the Department or to the public."  By incorporating City and department rules and regulations into the FOP contract and the City of Topeka Personnel Code, the City of Topeka has not waived the right to discipline its employees based on public or private expressions of opinion.  Accordingly, the Court reject plaintiffs' argument that they are entitled to summary judgment because defendants violated their First Amendment rights by proscribing their expression of opinions as private citizens.  Instead, the Court determines that plaintiffs, as public employees, are subject to the limited free speech rights as described in *Pickering* and *Connick*, and addresses this analysis below.  For the foregoing reasons, plaintiffs' summary judgment motion is denied.

### B.    *Pickering/Connick* Test

In determining whether a public employer's actions infringed on an employee's right to exercise his or her free speech, the Tenth Circuit applies the four part test from *Pickering* and *Connick* ("the *Pickering/Connick* test").[31]  Under that test, the court must determine:

> 1.  Whether the speech in question involves a matter of public concern.
> 2.  If so, [the court] must weigh the employee's interest in the

---

[31]*Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999) (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968)).

expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.

3.  Employee must show the speech was a substantial factor in driving the challenged government action.

4.  If so, can the employer show that it would have taken the same employment action against the employee even in the absence of the protected speech.[32]

The first two questions present legal issues to be resolved by the court because they "'concern whether the expression at issue is subject to the protection of the First Amendment.'"[33]  "The third and fourth steps are questions to be resolved by the jury because they concern causation."[34]

In this case, only the second step is at issue.  Defendants concede that plaintiffs' statements involve a matter of public concern.[35]  Therefore, the Court must determine whether plaintiffs' interest in the expression outweighs defendants' interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.  When conducting this balancing test, the Tenth Circuit has kept in mind "the heightened interest of a police department in maintaining discipline and harmony among employees."[36]

In balancing the competing interests, a court should also consider the disruption caused by an employee's speech.[37]  Relevant considerations include: "whether the [employee's speech]

---

[32]*Id.* (citing *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1271 (10th Cir. 1998)).

[33]*Weaver v. Chavez*, 458 F.3d 1096, 1100 (10th Cir. 2006) (quoting *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996)).

[34]*Id.*  (citing *Gardetto*, 100 F.3d at 811).

[35](Doc. 52 at 28.)

[36]*Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir. 1989) (citing *Koch v. City of Hutchinson*, 847 F.2d 1436, 1452 n.22 (10th Cir. 1988); *Waters v. Chaffin*, 684 F.2d 833, 836, 839 (11th Cir. 1982)).

[37]*Weaver*, 458 F.3d at 1100.

impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."[38] The employer carries the burden to establish the disruptive effects of the speech.[39]  While the Tenth Circuit defers to a public employer's reasonable predictions of disruption, such predictions must be supported by specific evidence.[40]  An employer cannot meet its burden with purely speculative allegations.[41]  However, the employer "is not required 'to allow events to unfold to the extent that the disruption of the office and the destruction of working relationship is manifest before taking action.'"[42]

Based on plaintiffs' statements, Chief Harsha had concerns about the reactions of the department's African-American employees.  Specifically, Chief Harsha was concerned about plaintiffs' working relationship with Major Kirk, an African-American, who as the Division Commander over Eaton and Campbell at the TPD, was responsible for overseeing and managing their work and setting policy for the division.  The Tenth Circuit acknowledges "that personal loyalty and confidence among employees are especially important in law enforcement."[43]

---

[38]*Rankin v. McPherson*, 483 U.S. 265, 388 (1978) (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563, 570–73 (1968)).

[39]*Weaver*, 458 F.3d at 1100.

[40]*Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (citing *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998)).

[41]*Id.* (citing *Cragg*, 143 F.3d at 1346).

[42]*Weaver*, 458 F.3d at 1100 (quoting *Connick v. Myers*, 461 U.S. 138, 152 (1983)); *see also Worrell v. Henry*, 219 F.3d 1197, 1208 (10th Cir. 2000) (determining that a prospective employer was not obligated to wait for an actual breakdown in the functioning of the department before taking action).

[43]*Worrell*, 219 F.3d at 1208 (citing *Lytle v. City of Haysville*, 138 F.3d 857, 867 (10th Cir. 1998); *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995); *Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir. 1989)).

Moreover, the Eighth Circuit has stated that "[b]ecause police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer."[44]  That court further stated "'when close working relationships are essential to fulfilling public responsibilities,' an employer's judgment may be given a 'wide degree of deference.'"[45]  In this case, Chief Harsha had concerns about the possibility of tension between Major Kirk and plaintiffs.  Major Kirk had read Eaton's letter to the editor, and told Chief Harsha that he was offended by it.  Major Kirk is a member of the NAACP, which Eaton referred to in his letter as a government sponsored/endorsed hate group.  And, Major Kirk compared some of the statements in Eaton's letter to the types of statements made by white supremacists.  Because of plaintiffs' statements, Major Kirk questioned what Eaton and Campbell thought of him as their commander, supervisor, and leader.  Moreover, other African-American officers expressed their concern and displeasure about plaintiffs' statements to Major Kirk.  This evidence shows that plaintiffs' statements had a disruptive effect on the working relationships at the TPD.

The Eighth Circuit has reached the conclusion that the balance tips in an employer's favor in a situation similar to the present one, when a plaintiff's speech disrupts the harmony or working relationships in a police department.  In *Tindle v. Caudell*,[46] the Eighth Circuit held that defendants, the City of Little Rock Police Department and the police chief, were entitled to

---

[44]*Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995) (citing *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1409 (8th Cir. 1990); *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984)).

[45]*Id.* (citing *Connick v. Myers*, 461 U.S. 138, 151–52 (1983)).

[46]56 F.3d 966 (8th Cir. 1995).

30

summary judgment on plaintiff's First Amendment claim.  In that case, plaintiff was a police officer who was suspended for thirty days after he attended a Halloween party, while off-duty, "dressed in blackface, wearing bib overalls and a black, curly wig, and carrying a watermelon."[47] It was undisputed in that case, as is uncontroverted in this case, that some African-American officers of the police department were offended by plaintiff's "speech"—his wearing the costume.[48]  Upon balancing the interests under the *Pickering/Connick* test, the court concluded that "[u]nder all of the circumstances, [plaintiff's] interest in appearing as he chose at the party does not outweigh the countervailing interests in maintaining discipline and harmonious working relationships within the [Little Rock Police Department]."[49]

In this case, the record also shows that plaintiffs' speech interfered with the regular operation of the TPD.  Plaintiffs argue that their speech, which occurred while they were off-duty, had a minimal effect on the functioning of the TPD; however, the evidence presented by defendants contradicts that assertion.  Plaintiffs argue that during this time period, the department was able to conduct its day-to-day operations without missing an assignment.  Even though the TPD was able to function without completely breaking down, there is ample evidence in the record that the controversy surrounding plaintiffs' statements caused significant disruptions in the operations of the TPD.  Further, even if the TPD was able to complete assignments on time, it "is not required 'to allow events to unfold to the extent that the disruption

---

[47]*Id.* at 968.

[48]*Id.* at 972.

[49]*Id.*

31

of the office and the destruction of working relationship is manifest before taking action.'"[50]

As examples of this disruption, Chief Harsha testified that as a result of the Eaton and Campbell matter, he lost focus on his day-to-day duties, and he had to delegate assignments to deputy chiefs. Chief Harsha spent significant time attending numerous meetings regarding plaintiffs' statements with the City Manager, the City legal department, and even the Mayor. He also attended a meeting of the YWCA Resource and Advocacy for Change and Equity (R.A.C.E.) Committee where citizens questioned him about the matter. Because of his work on the Eaton and Campbell matter, Chief Harsha missed staff meetings, crime update meetings, and two or three meetings of the Mayor's Crime and Safety Committee. He had to delegate a plan regarding a recent crime spree to another officer, and he had to defer implementation of a series of recommendations regarding the TPD narcotics unit. Chief Harsha also missed budget meetings because he was dealing with the Eaton and Campbell matter, causing the department to miss internal deadlines, and he was unable to devote attention to an investigation into the TPD helicopter crash.

Major Herman also provided evidence regarding the disruption of his duties at the TPD for about two to three months during the Eaton and Campbell controversy. Major Herman received one to four phone calls a day when the matter was discussed on the radio. The callers wanted to know why the TPD was tolerating plaintiffs' behavior, and Major Herman would spend fifteen to twenty-five minutes on each call. Major Herman also fielded probably a hundred questions from City Council members. Further, Major Herman was required to take

---

[50]*Weaver v. Chavez*, 458 F.3d 1096, 1100 (10th Cir. 2006) (quoting *Connick v. Myers*, 461 U.S. 138, 152 (1983)); *see also Worrell v. Henry*, 219 F.3d 1197, 1208 (10th Cir. 2000) (determining that a prospective employer was not obligated to wait for an actual breakdown in the functioning of the department before taking action).

complaints from the public, an assignment that is not part of his duties.  Some of these citizen

complaints were forwarded to Major Herman by the THRC, and Major Herman would go to that

organization to take the complaints.  On one occasion, Major Herman spent about four hours

with just one such complainant.  Major Kirk also had to take at least two complaints at the

THRC. Major Herman further testified that he had to shift responsibilities to subordinates during

this time because he was busy with work that Chief Harsha had delegated to him.  Major Herman

recalled that during this period, it was hard to get investigations done in a timely matter.

Colonel Wywadis noticed a change in the atmosphere at the TPD because people were

talking about the Eaton and Campbell matter instead of concentrating on investigations or going

out on the streets to service.  Major Kirk also found that officers were spending more time

listening to talk radio shows and discussing the matter instead of getting work accomplished.

There is also evidence of disruption at the TPD when Eaton returned to work, although

this disruption occurred after Chief Harsha imposed discipline.  Eaton admitted that he was

scared about going back to work because of the reaction to his statements and that he thought the

City was "on fire there for a while."  Chief Harsha and other officers had concerns about putting

Eaton back on the street where he would interact with minorities after the controversy

surrounding his comments.  Plaintiffs argue that this disruption was a result of Chief Harsha's

actions.  By demoting Eaton from the rank of detective to a patrol officer, Eaton argues that

Chief Harsha's discipline had more of a disruptive effect on the function of the TPD because

Eaton would have more interaction with the public.  Also, plaintiffs contend that the atmosphere

changed at the TPD because many officers disagreed with Chief Harsha's discipline and

supported plaintiffs' right to make such statements.  While there is some merit to this argument,

the Court does not find that Chief Harsha's actions were the sole cause of disruption at the TPD to tip the balance in favor of plaintiffs' interest in speech.  There is ample evidence in the record that plaintiffs' statements caused disruption in the police department, rather than Chief Harsha's actions.  Further, the Court is not in a position to question the type of discipline imposed on plaintiffs when police departments are "are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer."[51]

Also, courts give substantial weight to an employer's "reasonable predictions of disruption, even when the speech involved is on a matter of public concern."[52]  At the time Chief Harsha imposed discipline, there were valid reasons for predicting disruption in the operation of the TPD.  District Attorney Hecht expressed concern to Chief Harsha that issues of bias could be raised in cases involving Eaton and Campbell, and Chief Harsha was concerned about the chances of successful prosecutions if defense attorneys raised such issues.  In fact, District Attorney Hecht believes that in the aftermath of the controversy, plaintiffs' statements have affected judgments, considerations, and the practices of the Office of the District Attorney in evaluating and prosecuting criminal cases.  District Attorney Hecht requires that prosecuting attorneys file a "Notice of Submission of Material That May Arguably be Considered Exculpatory" in cases in which either Eaton or Campbell will be a material witness and the defendant is a member of a racial or ethnic minority.  This Notice has been filed in seven cases involving Campbell and five cases involving Eaton.

Chief Harsha additionally had concerns about plaintiffs' statements having the potential

---

[51]*Tindle*, 56 F.3d at 971 (citing *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1409 (8th Cir. 1990); *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984)).

[52]*Waters v. Churchill*, 511 U.S. 661, 673 (1994).

to bring the department into disrepute.  Chief Harsha was concerned about scrutiny from the

media, the THRC, and the NAACP.  As a result of plaintiffs' statements, meetings with the DOJ,

the NAACP and community leaders, have been held to mend the TPD's relationship with the

minority community.  Major Herman attended two of those meetings, and described the

atmosphere as being "brutal," and he recalled that the participants viewed the TPD as racially

insensitive.  Additional meetings have been scheduled to work on the community's perception of

the TPD.  Further, the City Manager has mandated that the TPD undergo additional cultural

training, and the TPD is trying to find additional funds in its budget to cover the cost of this

training.

In arguing that the balance tips in favor of their speech rights, plaintiffs rely on *Flanagan

v. Munger*.[53]  In that case, plaintiffs were police officers with the Colorado Springs Police

Department, who had part ownership interest in a video rental store that rented adult films.  After

the Chief of Police ordered plaintiffs to remove the adult films from the store and reprimanded

the officers for violating department policies, plaintiffs brought suit against the Chief of Police

and the city for violation of their First Amendment rights.  The court initially distinguished the

case from a typical case balancing the interests under the *Pickering/Connick* test because it

involved "'speech' which is off the job and unrelated to any internal functioning of the

department."[54]  In balancing the competing interests, the court stated that "'this type of off-duty

public employee speech must be accorded the same weight in absolute terms that would be

---

[53]890 F.2d 1557 (10th Cir. 1989).

[54]*Id.* at 1562.

35

accorded comparable . . . expression by citizens who do not work for the state.'"[55]  The court further found that this interest outweighed defendants' "attenuated" interest in preventing the speech, that being their interest in preventing erosion of public confidence and respect for the department, when there was no evidence of actual or potential disruption to the department based on the speech.[56]

However, this case is distinguishable from *Flanagan*.  First, the type of speech in this case is different from the plaintiffs' "speech" in *Flanagan*.  There, the court found that the speech was off-duty and not related to any functioning of the department.  In this case, while the conduct was off-duty, plaintiffs' statements had some relation to the function of the department.  As described more fully below, the manner in which plaintiffs made the statements involved the use of their TPD email accounts and the City's email system.  Also, in their communications, both plaintiffs referenced Overstreet's son and his case, on which Campbell had been working.  Second, as described above, defendants have presented sufficient evidence of actual disruption of the effective functioning of the TPD based on plaintiffs' speech.  Additionally, defendants have shown that the speech had a detrimental impact on the close working relationships at the TPD for which personal loyalty and confidence are necessary.  This case "contains the very kind of evidence lacking in *Flanagan*"[57] and therefore, plaintiffs cannot tip the balance of the *Pickering/Connick* test in their favor when there is ample evidence that defendants' interest in

---

[55]*Id.* at 1566 (quoting *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985)).

[56]*Id.*

[57]*Worrell v. Henry*, 219 F.3d 1197, 1208 (10th Cir. 2000) (distinguishing that case from *Flanagan* when there was evidence that plaintiff's speech would impair working relationships and would cause disruption of the efficient operation of the agency).

regulating the speech outweighed plaintiffs' interest in the speech.

When conducting the balancing test, a court should also look to "the manner, time, and place of the speech, as well as the context in which the dispute arose."[58]  Defendants place heavy emphasis on the fact that all of their statements were made from their homes while they were off-duty.  Nevertheless, the manner in which the statements were made is key to the analysis.  While Eaton and Campbell initially used their personal email accounts in responding to Overstreet's column, Campbell later forwarded the various email exchanges to his TPD email account. Campbell then sent these emails to Eaton and another TPD Detective at their respective TPD email accounts, and Campbell's signature block, identifying him as a detective of the TPD, was attached to this correspondence.  Eaton later accessed his TPD email account from home, replied to Campbell's previous email, and copied Overstreet on this communication, causing Overstreet to realize that Eaton and Campbell were TPD officers.  Although the plaintiffs made such statements at a time in which they were off-duty, the manner of communication of these statements was through the City's email system when they accessed their TPD accounts.  The publication of Eaton's statements is also relevant.  Eaton sent his letter to the editor to the TOPEKA METRO NEWS, and it was published in that newspaper on February 24.  Eaton's letter to the editor was also later published in the TOPEKA CAPITAL-JOURNAL in an article recounting the controversy surrounding the officers' statements and describing the matter as "heated."  By sending his letter to the editor to the TOPEKA METRO NEWS, the place of Eaton's speech was in a public forum that allowed his statements to be read by the Topeka community.

The manner and place of the plaintiffs' speech is relevant because it created controversy

---

[58]*Weaver v. Chavez*, 458 F.3d 1096, 1100 (10th Cir. 2006) (citing *Connick v. Myers*, 461 U.S. 138, 152–53 (1983)).

among the Topeka public and perhaps caused citizens to attribute plaintiffs' speech to the TPD

as a whole.  For instance, Sonny Scroggins found it offensive that Eaton "took certain liberties to

be the voice of the city and the Topeka Police Department, which gives the appearance of his

opinion being validated by the department and the city."

To be sure, the Court recognizes that it should not look to the effect of the speech outside

of the TPD because "the only public employer interest that can outweigh a public employee's

recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the

public employer's *internal* operations and employment relationships."[59]  In *Flanagan*, the Tenth

Circuit rejected defendants' argument that members of the public, offended by plaintiffs' speech,

would adversely impact the police department's external relationships and operations.  Finding

that the record in that case was devoid of any evidence of actual or potential disruption of the

department's *internal* operations, the court found that the balance of interests weighed in favor

of plaintiffs' speech.

However, unlike the facts in *Flanagan*, there is evidence in the record of actual

disruption of the internal operations of the TPD based on the public's reaction to plaintiffs'

comments.  Chief Harsha and Major Herman described how their work was disrupted, and how

their attention was diverted from normal duties as well as priorities.  While Chief Harsha was

dealing with the "fallout" of plaintiffs' statements, he had to delegate his work to deputy chiefs,

including a plan of action for a recent crime spree.  Instead of attending staff meetings, crime

update meetings, and budget preparation meetings, Chief Harsha had to attend numerous

meetings with the City Manager, the City legal department, and even the Mayor.  Chief Harsha

---

[59]*Flanagan*, 890 F.2d at 1566 (citations omitted) (emphasis in original).

also had to defer working on a plan to implement a series of recommendations regarding the

narcotics unit, and he was unable to attend to the investigation involving the helicopter crash.

Major Herman testified that his duties were disrupted for two to three months, while he

responded to numerous complaints from citizens and fielded dozens of questions from City

Council members.  He also had to take complaints at the THRC, for some citizens chose to

register complaints at the THRC rather than at the TPD, because of distrust.  All of this evidence

shows that the manner and place of plaintiffs' statements caused actual disruption to the internal

operations of the TPD.

In *Flanagan*, the Tenth Circuit also held that the department's action could not be

justified based on the reactions of some members of the public who found the speech—the

plaintiffs' interest in a video store that rented adult films—offensive.[60]  In doing so, the court

found that the Supreme Court's rejection of the "heckler's veto," which is the silencing of

someone through the public's heckling, lent support to its holding that defendants had only an

attenuated interest in preventing plaintiffs' speech.[61]  The Second Circuit, however, has found

that the "heckler's veto" argument does not apply in a case like this one, where public criticism

of the speech is coming from participants in a public service whose cooperation is important to

the functioning of that service.[62]  That court has recognized the potential for disruption based on

speech when effective operations of a police department rely on the respect and trust of the

---

[60]*Id.* at 1566.

[61]*Id.* at 1567.

[62]*Locurto v. Giuliani*, 447 F.3d 159, 179 (2d. Cir. 2006) (citing *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d. 185, 199 (2d. Cir. 2003)).

community.[63]  In *Pappas v. Giuliani*, plaintiff was terminated from his employment with the

New York City Police Department after his employer learned that plaintiff was anonymously

disseminating racist materials through the mail.  The court in that case found that the

department's "reasonable perception of serious likely impairment of its performance of its

mission" outweighed plaintiff's interest in free speech.[64]  In recognizing the importance of the

public's perception of a police department, the court stated:

> The effectiveness of a city's police department depends
> importantly on the respect and trust of the community and on the
> perception in the community that it enforces the law fairly,
> even-handedly, and without bias.  If the police department treats a
> segment of the population of any race, religion, gender, national
> origin, or sexual preference, etc., with contempt, so that the
> particular minority comes to regard the police as oppressor rather
> than protector, respect for law enforcement is eroded and the
> ability of the police to do its work in that community is impaired.
> Members of the minority will be less likely to report crimes, to
> offer testimony as witnesses, and to rely on the police for their
> protection.  When the police make arrests in that community, its
> members are likely to assume that the arrests are a product of bias,
> rather than well-founded, protective law enforcement.  And the
> department's ability to recruit and train personnel from that
> community will be damaged.[65]

The court found that the potential for plaintiff's speech to damage the effectiveness of the

department was immense, and that it also had the capacity to promote resentment, distrust, and

racial strife among the ranks of the department.[66]  In rejecting plaintiff's First Amendment claim

---

[63]*Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002).  *But see Flanagan v. Munger*, 890 F.2d 1557, 1566
(10th Cir. 1989) ("The department cannot justify disciplinary action against plaintiffs simply because some members
of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in
the future.").

[64]*Pappas*, 290 F.3d at 151.

[65]*Id.* at 146–47.

[66]*Id.* at 147.

in that case, the court stated that "an individual police officer's right to express his personal opinions must yield to the public good."[67]

The Second Circuit again applied this reasoning in *Locuto v. Giuliani*.[68]  In that case, plaintiffs brought a First Amendment claim against their employers after they were fired from the New York Police Department and the New York Fire Department for participating in a Labor Day parade, on a float that featured mocking stereotypes of African-Americans.[69]  In denying plaintiffs' claim, the court held that "the defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive interests in this case."[70]

In this case, Chief Harsha testified to his concerns about the potential for harm based on plaintiffs' statements.  Chief Harsha believed that such statements could interfere with recruitment of African-American officers to the TPD.  He was also concerned about the reactions of the department's African-American employees to the controversy.  Further, there is evidence in the record of distrust of the TPD after plaintiffs' statements were made.  Several community meetings were held in which citizens expressed their concerns about the statements.  Also, citizens began making complaints to the THRC rather than the TPD because of distrust of the police.  District Attorney Hecht also recognized that plaintiffs' statements may affect the minority community's perception of the TPD and its willingness to cooperate with law

---

[67]*Id.*

[68]447 F.3d 159 (2d. Cir. 2006).

[69]*Id.* at 163–65.  While not specifically stated in the recitation of the facts in that case, it can be inferred that the plaintiffs were off-duty when they participated in this Labor Day parade.

[70]*Id.* at 183.

enforcement in enhancing public safety.  This particular evidence supports defendants' strong interest in maintaining a trusting and respectful relationship between the TPD and the public, and provides justification for Chief Harsha's actions in disciplining plaintiffs' speech.

Upon viewing all of the evidence in the record, the Court concludes that the balance of interest weighs in favor of defendants' interest in effective and efficient law enforcement. Because plaintiffs' interest in their speech does not outweigh the employer's interest, plaintiffs have failed to meet the second prong of the *Pickering* and *Connick* test.  Accordingly, plaintiffs are not entitled to First Amendment protection for their speech, and Chief Harsha's summary judgment motion is granted.

### C.    Qualified Immunity

Chief Harsha also argues in his summary judgment motion that he is entitled to qualified immunity.  "When a defendant pleads qualified immunity, the plaintiff must show that: (1) the defendant's actions violated a federal constitutional or statutory right, and (2) the right violated was 'clearly established at the time of the conduct at issue.'"[71]  Because plaintiffs have failed to meet the initial burden of alleging a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity."[72]

Even if plaintiffs had shown a constitutional violation under the first requirement, Chief Harsha would be entitled to qualified immunity under the second requirement.  "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official

---

[71]*Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (citing *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277–78 (10th Cir. 1998)).

[72]*Saucier v. Katz,* 533 U.S. 194, 201 (2001).

42

would understand that what he is doing violates that right."[73]  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[74]

When determining whether a right is clearly established, the Tenth Circuit has found it important to "bear in mind that allegations of constitutional violations that require courts to balance competing interests may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity."[75]  Indeed, the Tenth Circuit has described the difficulty in applying the second prong of the *Pickering/Connick* test as: "How exactly we are to 'weigh' and 'balance' the radically incommensurate interests at stake in *Pickering*'s second prong is a matter of great debate and little certainty."[76]

Here, plaintiffs rely on the Tenth Circuit's decision in *Flanagan v. Munger*[77] to argue that there is clearly established law prohibiting Chief Harsha from issuing discipline to plaintiffs for speech that occurred while off-duty.  However, as shown above, this case is distinguishable from the facts of *Flanagan*.  In that case, while the court held that plaintiffs' rights were violated when they were disciplined for owning interest in a video store that rented adult films, the court balanced the competing interests under the *Pickering/Connick* test and held that plaintiffs'

---

[73]*Jantzen*, 188 F.3d at 1257.

[74]*Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) (citing *Stewart v. Donges*, 915 F.2d 572, 582–83, n.14 (10th Cir. 1990)).

[75]*Id.* at 1498 (citations omitted).

[76]*Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1328 (10th Cir. 2007).

[77]890 F.2d 1557 (10th Cir. 1989).

43

interest in speech outweighed defendants' interest in preventing it.[78]  Also, in that case, the court

granted qualified immunity to the police chief finding that the analysis under the

*Pickering/Connick* test showed the uncertainty of the issue under prior law, and thus, the law

was not clearly established.[79]  Plaintiffs also cite *Wulf v. City of Wichita*,[80] a case in which the

Tenth Circuit found that the plaintiff's First Amendment rights were violated when there was

insufficient evidence that the plaintiff's letter to the Attorney General alleging misconduct in the

police department interfered with the effective functioning of the police department.[81]

    As discussed above, the outcome of the second prong of the *Pickering/Connick* test

depends on whether a defendant can show sufficient disruption so that its interest in effective

operations outweighs a plaintiff's interest in speech.  While the Tenth Circuit was unable to find

sufficient disruption to outweigh the plaintiffs' interest in speech in *Flanagan* or *Wulf*, other

courts have found that an employer's actions are warranted when a plaintiff's speech impairs

harmony among co-workers, has a detrimental impact on close working relationships for which

personal loyalty and confidence are necessary, or disrupts the regular operation of the enterprise,

such as the case here.[82]  Therefore, the Court finds that plaintiff cannot show that Chief Harsha

---

[78]*Id.* at 1567.

[79]*Id.*

[80]883 F.2d 842 (10th Cir. 1989)

[81]*Id.* at 862.

[82]*See e.g.*, *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002) (holding that defendants' interest in preventing the impairment of its performance outweighed plaintiff's interest in disseminating racist materials anonymously through the mail); *Worrell v. Henry*, 219 F.3d 1197, 1208 (10th Cir. 2000) (affirming district court's dismissal of plaintiff's claim that employer refused to hire him in violation of his First Amendment rights and determining that the potential employer's interest in administering an effective drug task force outweighed plaintiff's interest in testifying at a trial); *Tindle v. Caudwell*, 56 F.3d 966 (8th Cir. 1995) (concluding that plaintiff's interest in wearing a costume to a party did not outweigh defendants' interest in maintaining discipline and harmonious working relationships within the police department).

violated a clearly established right when he disciplined plaintiffs for engaging in speech that

caused disruption in the TPD, when a determination of liability under such circumstances

requires balancing the interests of the parties under the *Pickering/Connick* test.  Accordingly,

Chief Harsha is entitled to qualified immunity, and his summary judgment motion is granted for

this reason as well.

### D.     Municipal Liability

Municipalities and other local governments, such as counties, may be sued under § 1983

for constitutional torts.[83]  A local government may be held liable where its action "*itself* violates

federal law, or directs an employee to do so."[84]  In order to establish liability, the government

official must have committed a constitutional violation, and the entity itself must have been the

"moving force" behind the alleged deprivation, so the entity's "policy or custom" must have

contributed toward the constitutional violation.[85]

As is the case with supervisory liability, "a municipality may not be held liable where

there was no underlying constitutional violation by any of its officers."[86]  In this case, the Court

has found that Chief Harsha did not violate plaintiffs' constitutional rights by issuing discipline

to them for violating department policies when they made certain statements in a letter to the

editor and in various emails.  Therefore, the Court grants the City of Topeka's Motion for

---

[83]*Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

[84]*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404–05 (1997).

[85]*Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 694–95 (1978); *Myers*, 151 F.3d at 1316.

[86]*Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *see Jiron v. City of Lakewood*, 392 F.3d 410, 419 n.8 (10th Cir. 2004) ("when a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation—i.e., the first step of the qualified immunity analysis—a finding of qualified immunity *does* preclude the imposition of municipal liability.").

Summary Judgment, and dismisses plaintiffs' First Amendment claims against this municipal entity.

## IV.     Conclusion

In this Order, the Court has considered the parties' cross motions for summary judgment. First, the Court denies plaintiffs' summary judgment motion finding that the City of Topeka has not waived the right to discipline its employees based on public or private expressions of opinion, and therefore plaintiffs are not entitled to judgment based on Chief Harsha's imposition of discipline for statements that plaintiffs made in violation of City and department policies. Second, the Court grants Chief Harsha's summary judgment motion.  The evidence shows that defendants' interest in the efficient operation of the TPD outweighed plaintiffs' interest in making certain statements regarding African-Americans and the African-American community in Topeka.  Therefore, Chief Harsha did not violate plaintiffs' constitutional rights to free speech by imposing discipline.  Further, Chief Harsha's summary judgment motion is also granted because he is entitled to qualified immunity.  Finally, defendant City of Topeka's summary judgment motion is granted because this municipality cannot be liable when there is no underlying constitutional violation by any of its officers.  Therefore, by granting summary judgment in favor of defendants, the Court dismisses this action in its entirety.

**IT IS THEREFORE ORDERED** that defendant Steve Harsha's Motion for Summary Judgment (Doc. 51) is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant City of Topeka, Kansas's Motion for Summary Judgment (Doc. 53) is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiffs' Motion for Summary Judgment (Doc. 57)

is **DENIED.**

**IT IS SO ORDERED**.

Dated this   4th    day of May 2007.

 S/ Julie A. Robinson         
Julie A. Robinson
United States District Court Judge